## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERICA J. FORBERGER, | ) | |
| | ) | Civil Action No. 10-376 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | ECF Nos. 10,12 |
| | ) | |
| Defendant | ) | |

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

Erica J. Forberger ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 – 1383f ("Act").  This matter comes before the court on cross motions for summary judgment. (ECF Nos. 10, 12).  The record has been developed at the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment is GRANTED, in part, and DENIED, in part, and Defendant's Motion for Summary Judgment is DENIED.

## II.  PROCEDURAL HISTORY

Plaintiff filed for SSI with the Social Security Administration April 4, 2008, claiming an inability to work due to disability beginning June 23, 2005. (R. at 113)[1].  Plaintiff was initially denied benefits on September 5, 2008. (R. at 66 – 70).  A hearing was scheduled for September 23, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 13).  A vocational expert, William Houston Reed, also testified. (R. at 13).  The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on October 7, 2009. (R. at 49 – 57).  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on January 23, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 4 – 6).

Plaintiff filed her Complaint in this court on March 24, 2010.  Defendant filed his Answer on June 11, 2010.   Cross motions for summary judgment followed.

## III.  STATEMENT OF THE CASE

A. General Background

Plaintiff was born on July 23, 1978, and was thirty one[2] years of age at the time of her administrative hearing. (R. at 17).  Plaintiff is a high school graduate with three years of post-secondary education at Clarion University in Pennsylvania. (R. at 17).  She has no learning disabilities. (R. at 190).  At the time of her hearing, Plaintiff lived with her fiancé, and was seven months pregnant. (R. at 20, 26).  She also had an eight year old son by another father, and had physical custody of the child every other weekend. (R. at 19 – 20).  Plaintiff was not employed at the time of the hearing, and had not worked since 2000. (R. at 18).

---

[1]      Citations to ECF Nos.5 – 5-9, the Record, *hereinafter*, "R. at __."

[2]      Plaintiff is defined as a, "Younger Person," at all times relevant to this determination. 20 C.F.R. § 416.963.

On June 23, 2005, Plaintiff was involved in a serious motor vehicle accident after losing consciousness at the wheel of her car. (R. at 177). Plaintiff had been under the influence at the time, and was not wearing a seatbelt. (R. at 177, 213). Her vehicle went off the road and crashed into an embankment, ejecting her approximately thirty feet from the car. (R. at 188). Plaintiff suffered various injuries to her face, head, neck, back, torso, and extremities. (R. at 177). Plaintiff underwent a series of operations in the following years to correct her physical injuries and related complications.

B. Treatment History – Physical

Computed tomography ("CT") scans of Plaintiff's cervical spine following her car accident on June 23, 2005, showed that Plaintiff had suffered multiple spinous process fractures from the C4 through C6 vertebrae. (R. at 246). Fracturing at the base of Plaintiff's skull was also noted. (R. at 246). However, Plaintiff's cervical spine alignment was normal, and her vertebral body heights were preserved. (R. at 246). CT scans of the lumbar spine showed normal alignment of the spine and preserved vertebral body heights without evidence of fracturing. (R. at 249). CT scans of the thoracic spine also yielded no evidence of fracturing, irregular alignment, or decreased vertebral body heights. (R. at 249). In addition to the damage to her cervical spine, Plaintiff also suffered fractures and lacerations of her face, a fractured hand, and fractured ribs. (R. at 219). The record indicates that alcohol was present in Plaintiff's system. (R. at 219).

Magnetic resonance imaging ("MRI") of Plaintiff's cervical spine on June 25 showed evidence of soft tissue edema at the C5 – C6 level of Plaintiff's spine. (R. at 237). Abnormal signals consistent with spinal cord contusion were also noted. (R. at 237). The MRI results were corroborative of earlier CT scans of the cervical spine. (R. at 237). No significant expansion or

compromise of Plaintiff's spinal cord was noted, however. (R. at 237). Plaintiff had initially suffered dense quadriparesis[3] due to spinal cord trauma. (R. at 212).

By June 28, Plaintiff's quadriplegia had improved dramatically, and it would eventually be resolved. (R. at 213). On June 30, Richard Spiro, M.D. performed a C5 – C6 and C6 – C7 discectomy and spinal fusion to stabilize Plaintiff's neck, as Plaintiff had suffered severe ligamentous injury in addition to fracturing her vertebrae. (R. at 222). Postoperatively, Plaintiff recovered well, and was transferred out of intensive care to a rehabilitation center in good condition on July 2. (R. at 220). In follow-up treatment, Plaintiff was found to be faring very well, and was noted as showing continued improvement. (R. at 172).

Plaintiff underwent plastic surgery in 2006 to minimize the facial scaring suffered in her car accident. (R. at 164). In recovery, Plaintiff's plastic surgeon consistently remarked that the surgery was a success, and Plaintiff was healing beautifully. (R. at 161 – 69). The residuals of Plaintiff's surgeries were nearly inapparent, and both Plaintiff and her doctor were very pleased with the results. (R. at 161 – 69).

In January of 2008, MRI scans of Plaintiff's cervical and lumbar spine showed no evidence of spinal stenosis, improper alignment, or significant disc pathology. (R. at 202 – 03). In Plaintiff's lumbar spine, there was a slight protrusion at the L5 – S1 level, but it was otherwise normal. (R. at 202). Plaintiff complained of low back pain, and left leg numbness. (R. at 443 – 44, 446). A compression fracture in the mid thoracic spine was noted in February of 2008. (R. at 382). In March of 2008, Dr. Spiro conducted an operation on Plaintiff's lumbar spine to relieve intractable left leg pain. (R. at 210). A discectomy was performed at the L5 – S1 level of Plaintiff's spine. (R. at 211). During the procedure, an incidental dural tear resulting in the

---

[3]     "Quadriparesis," is defined as the weakness of all four limbs, both arms and legs. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=5164 (last visited March 9, 2011).

leakage of some cerebrospinal fluid occurred, but it was repaired with minimal damage. (R. at 211).

At a follow-up to the surgery on April 16, 2008, Dr. Spiro indicated that Plaintiff experienced good relief of her leg pain, though she still felt some numbness in her left foot. (R. at 316). Plaintiff was healing well, there was no weakness in dorsiflexion or plantar flexion of her lower extremities, and her sensation was found to be well preserved. (R. at 316). Plaintiff visited the emergency room on April 22, complaining of back pain subsequent to a fall down a flight of steps. (R. at 437, 439). An x-ray of the lumbar spine showed that all bony structures were intact, the lordotic curve was intact, the disc spaces were normal, there was no abnormality in the joints, and there was no evidence of spondylolysis or spondylolisthesis. (R. at 269). The x-ray was considered to be normal. (R. at 269).

Plaintiff visited a pain treatment center in January and February of 2008. (R. at 193 – 97, 204 – 06). Plaintiff underwent a number of epidural injections and sacroiliac injections for pain relief. (R. at 193 – 97, 204 – 06). Plaintiff was noted as showing excellent improvement, but the pain center records do not extend beyond February 14, 2008. (R. at 193 – 97, 204 – 06).

Plaintiff was seen by David M. Zlotnicki, M.D. on March 6, 2009, due to ongoing complaints of low back pain with radiation to her left leg. (R. at 305). Dr. Zlotnicki observed moderate cervical tenderness, some muscle tightness, and slightly diminished cervical range of motion. (R. at 305). Plaintiff had some left lumbar tenderness. (R. at 305). Yet, her straight leg raises were negative, her lower extremities demonstrated intact sensation, and her upper extremities showed normal strength. (R. at 305). Plaintiff was diagnosed with cervicalgia and lumbar pain, status post-surgery. (R. at 305). She was encouraged to exercise consistently. (R. at 305).

Plaintiff was examined by Dr. Spiro on March 11, 2009. (R. at 315). Dr. Spiro indicated that Plaintiff had developed a recurrence of low back pain, and also suffered radiating pain in her legs – though her left leg was distinctly worse. (R. at 315). There was also numbness and tingling in the left foot. (R. at 315). Motor and sensory examinations showed that Plaintiff was intact throughout. (R. at 315). Straight leg raising was negative, and there was no noted abnormality with Plaintiff's deep tendon reflexes. (R. at 315). There were positive bilateral Hoffmann's[4] signs in her legs, however. (R. at 315).

On April 4, 2009, Plaintiff again appeared for an examination with Dr. Zlotnicki. (R. at 304). She complained of significant back and neck pain, and Dr. Zlotnicki noted mild to moderate diffuse lumbar tenderness, mild to moderate posterior cervical tenderness, fairly good cervical range of motion, and a normal gait. (R. at 204). Plaintiff was diagnosed with chronic back pain and cervicalgia. (R. at 304).

In August of 2009, Plaintiff sought treatment for right upper quadrant pain, abdominal pain, and pelvic pain. (R. at 365). An ultrasound of Plaintiff's abdomen revealed a distended gallbladder, but not gallstones or thickening of the gallbladder walls. (R. at 365). Plaintiff's pancreas was also swollen. (R. at 322). Plaintiff was initially diagnosed with cholecystitis and pancreatitis. (R. at 320, 322, 348). However, an ultrasound on August 25 did not uncover any evidence of cholecystitis or an enlarged pancreas. (R. at 345). Plaintiff's gallbladder remained grossly enlarged. (R. at 345).

Plaintiff was again diagnosed with pancreatitis and cholecystitis after an ultrasound on September 16, 2009. (R. at 433). Though Plaintiff was ambulatory, because of her continuing, worsening right upper quadrant pain, she was admitted to Clarion Hospital for possible surgery.

---

[4]     Hoffmann's sign is an abnormal, hyperactive reflex elicited in patients suffering brain damage. Taber's Cyclopedic Medical Dictionary 1004 (20th ed. 2005); Vol. 3 G-L, J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine H-163 (2010).

(R. at 418 – 19, 432).  Following admission to the hospital, Plaintiff's blood work showed improvement with respect to her pancreas and gallbladder, though the etiology of her issues could not be determined. (R. at 420, 424 – 32).  Plaintiff's pancreas appeared unremarkable after a sonogram on September 17. (R. at 417).  The gallbladder was still enlarged, though no stones were found. (R. at 417).  On September 19, it was determined that Plaintiff may be suffering pancreatitis secondary to gallbladder disease. (R. at 416).  Plaintiff was continued on intravenous fluids and bowel rest to treat her pain conservatively. (R. at 416).

    C.  <u>Treatment History – Mental</u>

On March 7, 2007, Plaintiff was voluntarily committed at Clarion Psychiatric Center. (R. at 177).  Plaintiff was twenty-eight years of age at the time, and complained that she was, "really depressed." (R. at 177).  At intake, Plaintiff alleged suffering from anxiety and unpredictable outbursts of anger. (R. at 177).  She recounted thoughts of suicide as well as some homicidal ideation accompanying her aggressive outbursts. (R. at 177).  Plaintiff also described avoidance behaviors, such as staying in bed all day. (R. at 177).

Much of Plaintiff's depression and emotional difficulties were attributed by Plaintiff to her car accident and resultant injuries. (R. at 177).  The events preceding the accident were also a source of significant distress, because Plaintiff claimed that someone slipped ten Ativan[5] tablets into her drink when she was at a laundromat.  (R. at 177).  The drug allegedly caused Plaintiff to black out while driving a short time later – inevitably leading to Plaintiff's accident. (R. at 177).  In the time following her physical recovery from the accident, Plaintiff stated that she had abused cocaine daily to treat her depression. (R. at 178).  She also abused marijuana up to twice a week.

---

[5]      "Ativan," also known as, "Lorazepam," is a benzodiazepine medication utilized in the treatment and relief of anxiety.  Side effects can include, amongst others, drowsiness, dizziness, tiredness, weakness, and blurred vision. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/ (last visited March 9, 2011).

(R. at 178).  Upon admission to the psychiatric facility, Plaintiff's blood tested positive for the presence of both drugs. (R. at 178, 181).

It was noted that prior to her admission, Plaintiff had once been admitted to Western Psychiatric Hospital when she was ten years of age. (R. at 178).  Following discharge from the hospital, Plaintiff attended counseling for one or two years. (R. at 178).  She described being physically and emotionally abused by her father, and sexually abused by the friend of an aunt when she was six years of age. (R. at 179).  Plaintiff had also suffered a miscarriage during an earlier pregnancy. (R. at 178).

At admission, Plaintiff was observed to be tense and depressed, and exhibited anxiety, lack of confidence, irritability, fatigue, confusion, anger, loneliness, fear, lack of self-worth, and hopelessness. (R. at 179).  However, she was cooperative, alert and oriented, had intact short and long term memory, and did not appear to suffer hallucinations or delusions. (R. at 179).  No bizarre behavior was witnessed, there was no pressure of speech, no flight of ideas, no loose associations or tangential thinking, she was of average intelligence, her insight was fair, and her activities of daily living were adequate. (R. at 180).  There was some evidence of mild motor activity agitation, and Plaintiff's judgment was marginal to poor. (R. at 180).  She was diagnosed with major depressive disorder, dysthymic disorder, cocaine dependence, nicotine dependence, and cannabis abuse. (R. at 180).  She was given a global assessment of functioning[6] ("GAF") score of 25. (R. at 180).

---

[6]        The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by

While at Clarion Psychiatric Center, Plaintiff underwent treatment for substance abuse, environmental stressors, and depression. (R. at 181). When she arrived at the center, she brought bottles of prescription medications she claimed she received from Paul Hamm, M.D., although Dr. Hamm's office had no record of the prescriptions. (R. at 181). Plaintiff was prescribed new medication while at the center. (R. at 181).

At the time of discharge, it was noted that Plaintiff had progressed well, showing steady improvement and active participation throughout her treatment. (R. at 181 – 82). She also made clear her desire to abstain from future substance abuse. (R. at 181 – 82). Plaintiff's diagnoses continued to include major depressive disorder, dysthymic disorder, cocaine dependence, nicotine dependence, and cannabis abuse, but her GAF score was revised upward to 60. (R. at 181). She was given only a fair prognosis at discharge – mainly because of her history of substance abuse. (R. at 182). Plaintiff was to follow up with Clarion County Counseling Center. (R. at 182).

Plaintiff followed up at the counseling center on March 23, 2007. (R. at 188). Plaintiff claimed that she was depressed most of the time, and struggled with feelings of worthlessness, emotional distance, isolation, coldness, restlessness, impulsivity, anger, and anxiety. (R. at 189). She claimed to suffer panic attacks and uncontrolled mood vacillations. (R. at 189). She also could become hostile towards others – including family – when she felt bothered. (R. at 189). Since her car accident, Plaintiff alleged an inability to concentrate or focus. (R. at 189).

At this time, Plaintiff attributed much of her suffering to her earlier car accident, and explained that the accident had occurred as a result of being drugged with Ativan while at a male

---

delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

friend's house.[7] (R. at 188). Her only memory is of watching the eleven o'clock news, and then waking up in the hospital. (R. at 188). She believed she passed out while driving her car. (R. at 188). Plaintiff explained that she had suffered a serious head injury, had broken all of the bones in her face, broke numerous vertebrae, broke all of her ribs, broke a hand and arm, and damaged her spleen. (R. at 188, 191).

Plaintiff was observed to be cooperative and appropriately dressed, and she maintained eye contact throughout her follow-up interview. (R. at 189). Plaintiff stated that she enjoyed fishing, hiking, and pottery. (R. at 190). She also explained that she had a good relationship with her mother, and had two very good friends with whom she enjoyed a close, trusting relationship. (R. at 190).

Plaintiff continued to attend therapy at the counseling center until October of 2007, when she could no longer be reached by the center. (R. at 184 – 85). She did not re-start therapy at the center until March 25, 2009. (R. at 410). At that time she was pregnant, and expected to deliver her child on November 16. (R. at 410). She had stopped taking all medications since learning she was pregnant, and was struggling with back pain and depression as a result. (R. at 410). Her symptomology had not changed significantly since her earlier treatment period. (R. at 410). However, she claimed that a distant relative had sexually abused her on two occasions when she was five years of age. (R. at 412). Plaintiff expressed that she enjoyed poetry, camping, fishing, and horseback riding. She also explained that she maintained a close relationship with four friends, and visited with them regularly. (R. at 411).

The notes from March 25 indicate that following her prior period of treatment at the center, Plaintiff was arrested three times – she received two citations in Clarion County,

---

[7] This differs from her statement at page 177 of the Record, cited on page 7, where she stated that the Ativan was slipped to her while at a laundromat.

Pennsylvania, for driving under the influence, and one such citation in Clearfield County, Pennsylvania. (R. at 412). She spent May of 2008 through November of 2008 in the Clarion County Jail, and November of 2008 through February of 2009 in the Clearfield County Jail, as a result. (R. at 412). Plaintiff explained that she engaged in significant alcohol and substance abuse prior to her incarceration. (R. at 412).

While attending treatment at the counseling center, Plaintiff underwent a psychiatric evaluation by Joseph C. Maisonneuve, M.D. on June 12, 2009. (R. at 318). Plaintiff's chief complaints at the time were depression and anxiety – and she continued to remain off of all medications due to her pregnancy. (R. at 318). Plaintiff also had difficulty sleeping. (R. at 318). Her appetite was normal, however, and she was cooperative, was not in any distress, exhibited no psychomotor agitation, was fully ambulatory, was alert and oriented, exhibited clear, coherent, and relevant, goal-directed speech, showed no symptoms of hallucination or delusion, had an adequate fund of knowledge, was able to think abstractly, and was noted to have intact memory. (R. at 318 - 19). With respect to past abuse, Plaintiff's only claim was that her father physically and sexually abused her when she was four to five years of age. (R. at 318). Plaintiff was diagnosed as suffering from recurrent, moderate major depressive disorder, and polysubstance dependence in early remission. (R. at 319). She was assessed a GAF score of 50. (R. at 319).

   D. Incarceration

The medical records from Plaintiff's time in jail indicate that she suffered from pain related to her neck and back, and that she was depressed and anxious. (R. at 288 – 291, 293). Plaintiff also discovered that she was pregnant while incarcerated. (R. at 292). The reflexes in Plaintiff's left leg were noted to have weakened in June of 2008. (R. at 291). Yet, despite pain

and spasm in her neck, and pain radiating from her lower back, Plaintiff was found to have no focal weakness in her upper extremities, and ambulated well. (R. at 289).

E.  Functional Capacity

Plaintiff was scheduled for evaluations by state agency consultants on a number of occasions in 2008, but failed to appear because she was incarcerated. (R. at 45, 140 – 41, 145 – 46, 274 – 86).  On March 6, 2009, however, one of Plaintiff's treating physicians, Dr. Zlotnicki, filled out an Employability Assessment Form for the Pennsylvania Department of Public Welfare. (R. at 300).  In it, he indicated that Plaintiff was permanently disabled, by history. (R. at 299).  He indicated that chronic lumbar and cervical back pain, status post cervical and lumbar surgeries, and ongoing depression, rendered Plaintiff completely incapable of maintaining employment. (R. at 299).  Dr. Zlotnicki also indicated that he did not have the benefit of medical records, clinical histories, or the results of tests and diagnostic procedures at his disposal when making his disability determination. (R. at 299).  No functional limitations findings were made. (R. at 299).

F.  Administrative Hearing

Plaintiff began the administrative hearing by explaining her work history.  In 2000 she had worked for, "Help Maids," a home-based service wherein Plaintiff would help the elderly with household needs, bathing, and grocery shopping. (R. at 18).  In 1999, Plaintiff worked at "Barrett's Manor," personal care home. (R. at 18).  There she performed cooking, cleaning, and bathing of the elderly residents. (R. at 18 – 19).  In 1996 – 97, Plaintiff was employed as a laborer in a greenhouse. (R. at 19).  Plaintiff initially ceased working in order to attend Clarion University, and then to care for her newborn son. (R. at 19).  Following her accident, she did not seek further employment. (R. at 33).

Plaintiff has abstained from drug and alcohol abuse since November of 2007, following her incarceration for driving under the influence and delivery of a controlled substance. (R. at 22, 33). Subsequently, Plaintiff attended Clarion Counseling Center every two weeks for her drug abuse and mental health issues. (R. at 26). Every few months Plaintiff visited a psychiatrist for medication management. (R. at 26). She also regularly saw an obstetrician because of her pregnancy. (R. at 26).

The car accident in 2005 required that Plaintiff undergo surgery on her cervical and lumbar spine. (R. at 27). Since that time, she claimed to have suffered chronic pain beginning in her neck and radiating down the back, through both legs, and into her feet. (R. at 27). Her left leg accounted for most of her pain, and her left foot felt numb. (R. at 27). Her mid and lower back also spasmed frequently. (R. at 27). On a pain scale of ten, Plaintiff rated her average pain level as an eight. (R. at 28). Plaintiff also experienced headaches, some of which she described as migraines, and some of which she described as originating from her neck. (R. at 30). The headaches would make her nauseous and affect her vision. (R. at 30). The headaches would occur three to four days a week and pain medication provided no relief. (R. at 30 – 31). Gallbladder and pancreatic issues also caused her some stomach discomfort. (R. at 34). Plaintiff claimed her doctors maintained her on a liquid diet until her gallbladder and pancreatic issues could be resolved. (R. at 35).

To treat her pain, Plaintiff would take Percocet and Fentanyl. (R. at 28). As a result of her pregnancy, however, Plaintiff could only take Tylenol for her pain. (R. at 28). She testified that the Tylenol provided her with no relief, and her prior prescription pain medications did little more than take the edge off. (R. at 28). Plaintiff underwent physical and occupational therapy following her accident to help her re-learn to walk and use her hands, and to strengthen her

muscles. (R. at 28).  She had not engaged in any similar therapy since. (R. at 28).  Plaintiff claimed her pain was worst when she was on her feet or when she was exposed to damp air. (R. at 29).  Assuming any posture for too long exacerbated her pain. (R. at 29).

Before her pregnancy, Plaintiff's prescription medications included Celexa, Seroquel, Tegretol, Thorazine, Percocet, Soma, and Xanax, for her physical pain and psychiatric health. (R. at 29).  Plaintiff explained that following her cessation of these medications, she became more depressed, and experienced more extreme mood swings. (R. at 29).  She testified that her ability to concentrate and focus decreased to the point that she withdrew from college. (R. at 30). Allegedly, there was a noticeable uptick in her anxiety levels. (R. at 30).  Plaintiff often had uncontrollable outbursts of anger. (R. at 31 – 32).

In terms of daily activities, Plaintiff claimed that she could stand and wash dishes for approximately fifteen minutes before needing to sit and rest. (R. at 20).  Plaintiff occasionally accompanied her fiancé to the grocery store, but was always worn out for the remainder of the day as a result. (R. at 20).  They also shared laundry duty, though the fiancé did most of the work. (R. at 21).  Plaintiff did not vacuum, but did help with dusting. (R. at 20 – 21).  She cooked intermittently, and would make herself simple lunches. (R. at 21, 24 – 25).  The yard work was done only by the fiancé, as was the driving, because Plaintiff lost her license due to being caught driving under the influence. (R. at 21).  Plaintiff had no hobbies, but she would sometimes play video games, watch television, and complete crossword puzzles. (R. at 24).  She could attend to her personal needs, but claimed that sometimes she would not bathe for a couple of days in a row. (R. at 32).

Functionally, Plaintiff asserted that she could only sit up straight for, "a couple of minutes," before either needing to lie down or stand and walk, because of constant aching and

spasm. (R. at 22, 25). She could only stand for approximately fifteen minutes, and could only walk approximately one city block. (R. at 23). Lifting five to ten pounds was within her perceived limits. (R. at 23). Plaintiff stated that she spent most of her day reclined in a chair. (R. at 23 – 24). She would talk to her sister and her son on the phone every day. (R. at 23, 25). She typically napped for two hours a day because of back pain or due to her depression. (R. at 23). Her sleep was often disturbed, however, because of pain and/ or racing thoughts. (R. at 25). Plaintiff believed she was unable to engage in full-time employment because she suffered from chronic pain, depression, and anxiety, was prone to angry outbursts, and because she did not feel like dealing with other people. (R. at 33 – 34).

After Plaintiff testified, the ALJ asked the vocational expert whether any jobs would be available to a hypothetical person of Plaintiff's age, education, and work experience, but limited to sedentary work involving only simple work related decisions and relatively few workplace changes. (R. at 36 – 37). The vocational expert replied that available jobs would include: "call out operator," with 47,000 positions available in the national economy; "surveillance system monitor," with 95,000 jobs available; and "assembler," with 104,000 positions available. (R. at 37).

The ALJ then asked whether the above opportunities would change if the hypothetical person would also require a sit/ stand option, and would be limited to work that is not performed in a fast-paced environment. (R. at 38). The vocational expert stated that the first two positions would remain the same, but that the number of available "assembler" positions would be reduced to 50,000, nationally. (R. at 38). The ALJ also asked if jobs would be available to the hypothetical person if he or she would require frequent breaks and absences at will. (R. at 38). The vocational expert responded that no jobs would be available to such a person. (R. at 38).

Plaintiff's attorney asked what jobs would be available to the hypothetical person if a tolerance for aggressive verbal interaction with the public, co-workers, and supervisors was necessary. (R. at 38). The vocational expert answered that no jobs would be available with such a tolerance. (R. at 38 – 39).

The administrative hearing concluded with Plaintiff's attorney requesting that the ALJ leave the record open for additional evidentiary submissions for a further twenty days. (R. at 40). The ALJ agreed to the request. (R. at 40). Plaintiff's attorney also informed the judge that certain of Plaintiff's treatment files from Clarion Counseling Center would require the issuance of a subpoena if the judge felt it was necessary to view these files. (R. at 40).

## IV.   STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[8] and 1383(c)(3)[9]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the

---

[8]      Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[9]      Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential

analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

V.   DISCUSSION

In her decision, the ALJ concluded that Plaintiff suffered from severe medically determinable impairments in the way of residuals from a motor vehicle accident including degenerative disc disease involving the cervical spine status post cervical discectomy and fusion, degenerative disc disease of the lumbar spine status post lumbar surgery, headaches, and major depression. (R. at 51). Despite these impairments, the ALJ determined that Plaintiff was capable of engaging in substantial gainful employment on a full-time basis because Plaintiff's impairments only limited her to sedentary work involving simple work-related decisions and

relatively few workplace changes, and – based upon the testimony of a vocational expert – job opportunities existed for Plaintiff in significant numbers in the national economy. (R. at 53). Plaintiff was not, therefore, eligible for SSI. (R. at 57).

Plaintiff objects to the ALJ's determination that Plaintiff's pain and depression are not disabling, arguing that: the ALJ did not properly consider Plaintiff's impairments at Step 3 of the disability analysis; the ALJ's RFC assessment was not based upon substantial evidence; and, the ALJ failed to issue a subpoena seeking additional evidence of Plaintiff's psychiatric treatment. (ECF No. 11 at 14 – 19). Plaintiff further argues that the ALJ's decision should be remanded because the Appeals Council improperly redacted/ removed portions of the record, denying Plaintiff due process. (ECF No. 11 at 20).

Plaintiff first argues that the ALJ erred, in part, at Step 3 by failing to explicitly identify and discuss relevant listings under 20 C.F.R., Pt. 404, Subpt. P, Appx. 1. (ECF No. 11 at 14). The Court of Appeals for the Third Circuit has endorsed a more flexible approach at Step 3 than Plaintiff advocates. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). There is no requirement that the ALJ "use particular language or adhere to a particular format in conducting his analysis." *Wisniewski v. Commissioner of Social Security*, 210 Fed. Appx. 177, 180 (3d Cir. 2006) (quoting *Jones*, 364 F.3d at 505). The ALJ need only clearly and thoroughly discuss the pertinent medical evidence of record, such that a reviewing court can engage in meaningful review of the decision in light of relevant impairment listings. *Id.*; *Scatorchia v. Commissioner of Social Security*, 137 Fed. Appx. 468, 470 – 71 (3d Cir. 2005); *Scuderi v. Commissioner of Social Security*, 302 Fed. Appx. 88, 90 (3d Cir. 2008). There is no necessity for the ALJ to either explicitly identify or analyze the most relevant listing. *Id.* Yet, the ALJ did just that in her decision, identifying relevant listings and analyzing the requirements of each. (R. at 52 – 53). It

is Plaintiff who fails to provide which relevant listings she believes the ALJ failed to mention, and further fails to explain how Plaintiff's impairments – individually or in combination – would have qualified her for disability benefits in spite of the ALJ's analysis.

Plaintiff correctly points out, though, that the ALJ erred, in part, in conducting her Step 3 analysis by failing to obtain a state agency consultative examination when determining whether Plaintiff met any of the listings under 20 C.F.R., Pt. 404, Subpt. P, Appx. 1. SSR 96-6P, 1996 WL 374180 at *1 – 3 (S.S.A. 1996) ("An updated medical expert opinion *must be obtained* by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made.") (emphasis added). While the ALJ is not bound by the findings made by a state agency examiner in his or her report, the ALJ is required to receive these findings and weigh them accordingly. *Id.* In the present case, there is no evidence indicating that Plaintiff ever underwent any consultative examinations for purposes of her disability determination. Considering that Plaintiff had been incarcerated during the period in which she had been scheduled for consultative examinations and could not attend an exam or be evaluated in jail, an examination should have been scheduled upon her release, as good cause was provided by counsel for not attending earlier appointments. (R. at 45, 140 – 41, 146 – 47).

Plaintiff next correctly argues that the ALJ failed to support her RFC assessment with substantial evidence. (ECF No. 11 at 16 – 20). Generally, "'residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's RFC represents the most – not the least – that a person can do despite his or her limitations. *See Cooper v. Barnhart*, Civ. A. No. 06-2370, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008)

(citing 20 C.F.R. § 416.945(a)); SSR 96-8P, 1996 WL 374184 at *1 – 2 (S.S.A. 1996). In determining a claimant's RFC, an administrative law judge must consider all evidence of record and the claimant's subjective complaints and statements concerning his limitations. 20 C.F.R. §§ 416.945(a), 416.920.

An ALJ must weigh the credibility of the evidence when making a RFC determination, and must give some indication of the evidence which is rejected and the underlying reasoning. *Burnett*, 220 F.3d at 121. The review of the evidence of record need not be exhaustive, but should "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981). As the Court of Appeals held in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* (quoting *Cotter,* 642 F.2d at 705).

With respect to Plaintiff's activities of daily living, the ALJ failed to create a complete picture of the extent to which Plaintiff engaged in said activities. (R. at 52). Plaintiff's performance of daily activities played an obviously important role in the ALJ's determination. (R. at 52, 54 – 55). Yet, in crediting Plaintiff's own accounts of her daily activities, the ALJ omits – without proper explanation – Plaintiff's testimony regarding her associated limitations in performing these activities. Her claimed limitations include the ability to stand for no more than fifteen minutes, the inability to go to the grocery store more than intermittently – causing significant fatigue when attempted, only occasionally being able to help with laundry – most being done by her fiancé, the ability to only minimally participate in cleaning of her home, inability to do more than occasional cooking, only intermittently playing video games, watching television, or completing puzzles, inability to sit up for more than a few minutes, frequent need

to lie down or stand and walk due to chronic back pain and spasm, frequent need to recline in a chair due to pain, and frequent need to sleep during the day due to headaches and depression. (R. at 20 – 25).

An ALJ should accord subjective complaints the same treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). Moreover, there need not be objective evidence of a subjective complaint, and the ALJ must explain his rejection of same. *Id.* The ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints. *Id.* "[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck*, 181 F.3d at 433 (emphasis omitted).

The ALJ cannot utilize Plaintiff's subjective statements to support a conclusion that Plaintiff can engage in substantial gainful activity on a regular and continuous basis, without acknowledging and discussing the rejection of Plaintiff's subjective testimony suggesting greater limitation than the ALJ's decision rationale found. Moreover, as was explained by the vocational expert, if Plaintiff would need frequent breaks during her employment, like those Plaintiff's complained of symptoms might require, Plaintiff would be disqualified from all types of work. (R. at 38). As such, the ALJ should have dedicated greater discussion to Plaintiff's subjective complaints.

In terms of the injuries Plaintiff's sustained in her car accident, the ALJ similarly failed to account for all relevant evidence influencing the severity of these injuries and the implications with respect to Plaintiff's ability to work. The ALJ determined that Plaintiff's physical injuries would not prevent her from engaging in sedentary work because her treating physicians indicated that she had recovered satisfactorily, experienced good relief, could ambulate without an assistive device, had a good range of motion, had a normal gait, had no motor, sensory, or reflex loss, and had negative straight leg raising. (R. at 54).

However, the ALJ erred in failing to discuss the implications of the later discovery of positive Hoffmann's signs in Plaintiff's legs, continual numbness in Plaintiff's left foot, and recurring pain radiating down Plaintiff's back and into her legs. "The ALJ must 'do more than simply state ultimate factual conclusions . . . the ALJ must include subsidiary findings to support the ultimate findings' and must provide 'not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significantly probative evidence was not credited or simply ignored.'" *Brophy v. Halter*, 153 F.Supp.2d 667, 673 (E.D.Pa. 2001) (quoting *Stewart v. Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983). *See also Ginther v. Commissioner of Social Security*, 2010 WL 2253748 at *8 (W.D.Pa. 2010). An ALJ cannot reject relevant and probative evidence of impairment without discussing his or her rejection. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 204 (3d Cir. 2008).

Similarly, despite determining that Plaintiff suffered a severe medical impairment in the way of frequent headaches, the ALJ spent no time discussing the potential implications such headaches would have respecting Plaintiff's ability to work. This is particularly important in light of Plaintiff's testimony regarding the frequency and severity of the headaches. (R. at 30 –

31).  Yet, the ALJ failed to provide any evidence which would counter – or even mitigate – Plaintiff's claims before clearly omitting the claims from her discussion.

It is of some note that the ALJ also provided no objective medical evidence from the record directing that Plaintiff had the ability to engage in full-time sedentary work eight hours a day, five days a week.  There were no physician reports of any sort indicating that Plaintiff's physical condition – while having improved immensely following a car accident that rendered Plaintiff quadriplegic – would allow her to engage in substantial gainful activity.  As a lay fact-finder, it is the ALJ's responsibility to secure a medical opinion explaining a claimant's functional limitations. *Rivera-Torres v. Secretary of Health and Human Services*, 837 F.2d 4, 6 (1st Cir. 1988) (citing 20 C.F.R. § 404.1513(b) and (c)); *Brown v. Barnhart*, 285 F.Supp.2d 919, 931 – 32 (S.D.Tex. 2003); *Woodford v. Apfel*, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000); *Gathright v. Shalala*, 872 F.Supp. 893, 898 (D.N.M. 1993).  The ALJ is not permitted to speculate based solely upon his or her interpretation of the medical records, and must properly develop the record with regard to facts essential to a disability determination. *Woodford*, 93 F.Supp.2d at 529 (citing 20 C.F.R. § 404.1512(e)); *Brown*, 285 F.Supp.2d at 931 – 32.  Having found no medical opinion from any source indicating Plaintiff's functional limitations, the ALJ erred in failing to at least obtain a consultative examination.

The ALJ did not, however, improperly dismiss Dr. Zlotnicki's disability conclusion.  While his opinion may be entitled to consideration, the determination of disabled status for purposes of receiving SSI - a decision reserved for the Commissioner, only - will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. § 416.927(e).  Dr. Zlotnicki's limited treatment history, the apparent inconsistency with previous examination findings by Dr. Zlotnicki, and the lack of citation to clinical findings by

Dr. Zlotnicki to support his conclusion, all supported the ALJ's decision not to give weight to his finding of disability. (R. at 55). *See Ginther*, 2010 WL 2253748 at *8 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985); 20 C.F.R. § 416.927(d)). Still, this court will not find that substantial evidence supported the ALJ's RFC assessment, because certain relevant factors were not discussed, and medical opinions regarding Plaintiff's functional limitations were not gathered.

Lastly, Plaintiff argues that her procedural due process rights were violated by the ALJ's failure to obtain a subpoena for certain psychiatric treatment records from Clarion Counseling Center. (ECF No. 11 at 20). A review of Plaintiff's alleged request from the hearing transcript discredits this assertion.

> ATTY: And just so the court understands, I have made numerous requests for the Clarion Counseling Center records. They will not send me - - if the court wants to look at anything other than that psychiatric, I think a subpoena will be necessary. They're taking the position that they won't send therapy records without a subpoena. I don't know if the court thinks that you need to see that, but - -
>
> ALJ: Well, why don't you - - I'll give you 20 days to try to get that evidence.

(R. at 40). At no point in the conversation with the ALJ did Plaintiff's counsel actually request a subpoena. Plaintiff's counsel appears only to suggest that, if the ALJ so desired it, additional record information could be obtained with the use of a subpoena. The testimony certainly falls short of a demand for a subpoena. Having left the decision to seek these additional records

within the sole discretion of the ALJ, Plaintiff cannot argue that she was denied due process when the ALJ did not subsequently issue a subpoena.

The court also finds Plaintiff's procedural due process claim surrounding the removal of certain pages from the record to be unavailing. (ECF No. 11 at 20). The Appeals Council clearly indicated which pages were removed from the record and the reason therefore – that the pages pertained to a third party and were not relevant to the present case. (R. at 215 – 18, 226 – 27, 241, 251, 253, 255, 261 – 64). All the pages removed were a part of Exhibit 5F, available to Plaintiff prior to the Appeals Council's actions. (R. at 16). However, Plaintiff fails to make any specific averments with respect to the removed files – in that either the files were pertinent to the present case or were relied upon by the ALJ in making her determination. Plaintiff only summarily asserts that the Appeals Council's actions were fundamentally unfair, because Plaintiff was not allowed an opportunity to challenge the removal of the pages in question. The ALJ cites Exhibit 5F once in her decision, but Plaintiff – despite having the luxury of access to the unaltered exhibits prior to the Appeal's Council's actions, fails to indicate that the ALJ relied upon one of the removed pages, or that removing the pages could have altered the outcome of the case because of its relevance. In light of Plaintiff's access to the original Exhibit 5F in its entirety, the failure to specifically aver how the removal of certain pages was harmful or unfair renders her procedural due process claim insufficient.

VI.    **CONCLUSION**

Based upon the foregoing, the ALJ failed to adequately justify her decision. In terms of whether Plaintiff's meets any of the impairment listings, the ALJ should have ordered a consultative evaluation to aid in her determination. With respect to the RFC assessment, the

ALJ's failure to adequately address relevant, probative evidence and to seek the opinion of a medical source regarding Plaintiff's functional limitations deprives the court of the benefit of a full explanation of the ALJ's determination. As a result, this court will not conclude that substantial evidence supported the ALJ's decision.

"On remand, the ALJ shall fully develop the record and explain [her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Commissioner of the Social Security Administration*, 625 F.3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

Accordingly, Plaintiff's Motion for Summary Judgment is granted to the extent it seeks further review by the ALJ, and denied to the extent it seeks a reversal and entry of final judgment in favor of Plaintiff. Defendant's Motion for Summary Judgment is denied; and, the decision of the ALJ is vacated and the case remanded for further consideration not inconsistent with this opinion. An appropriate Order follows.

March 21, 2011

Lisa Pupo Lenihan
United States Magistrate Judge

cc/ecf: All counsel of record.